# Pennsylvania Telephone Company *v.* Hoover, Appellant.

*Telephone companies—Eminent domain—Corporations—Act of April* 29, 1874, *sec.* 33, *P. L.* 73.

Under the Act of April 29, 1874, sec. 33, P. L. 73, a telephone company has not the right of eminent domain over the private lands of individual owners.

It seems that a telephone company is a telegraph company within the meaning of section 33 of the Act of April 29, 1874, P. L. 73.

Argued March 11, 1903. Appeal, No. 21, March T., 1903, by defendant, from decree of C. P. Dauphin Co., Equity Docket No. 298, continuing preliminary injunction in case of Pennsylvania Telephone Company v. Charles Hoover. Before BEAVER, ORLADY, SMITH, PORTER, MORRISON and HENDERSON, JJ. Reversed.

Bill in equity for an injunction to restrain defendant from interfering with the working and use of telephone lines constructed upon his lands. Before WEISS, P. J.

Motion to continue preliminary injunction.

The only question involved was the right of the plaintiff to exercise the power of eminent domain.

*Error assigned* was decree continuing preliminary injunction.

*William H. Middleton*, for appellant.—A telephone company is not a species of telegraph company : Richmond v. Southern Bell Telephone, etc., Co., 174 U. S. 761 (19 Sup. Ct. Rep. 778).

A power not clearly given must be deemed withheld : Bradford v. Telephone Co., 26 Pa. C. C. Rep. 321; Phillips v. R. R. Co., 78 Pa. 177; Bank of Penna. v. Com., 19 Pa. 144; Susquehanna Boom Co. v. DuBois, 58 Pa. 182.

*Addison Candor*, with him *John E. Fox* and *C. La Rue Munson*, for appellee.—A telephone company is a telegraph company : Attorney General v. Edison Telephone Co. of London, L. R. 6 Q. B. Div. 244; Wisconsin Telephone Co. v. City of Oshkosh, 62 Wis. 32 (21 N. W. Repr. 828); Iowa Union Telephone Co. v. Board of Equalization, 67 Iowa, 250 (25 N,

W. Repr. 155); Franklin v. Northwestern Telephone Co., 69 Iowa, 97 (28 N. W. Repr. 461); Cumberland Tel. & Tel. Co. v. United El. Ry. Co. et al., 42 Fed. Repr. 273; State v. Cent. N. J. Tel. Co. et. al., 53 N. J. L. 341 (21 Atl. Repr. 460); Hudson River Telephone Co. v. Watervliet Turnpike & Railway Co., 135 N. Y. 393 (32 N. E. Repr. 148); Cent. Pa. Tel. & Sup. Co. v. Wilkes-Barre, etc., Ry. Co., 11 Pa. C. C. Rep. 417 (1 Pa. Dist. Rep. 628); York Telephone Co. v. Keesey, 5 Pa. Dist. Rep. 366; Bradford City v. Pa. & N. Y. Tel. & Tel. Co., 26 Pa. C. C. Rep. 321; People's Telephone & Telegraph Co. v. Berks, etc., Turnpike Co., 199 Pa. 411; Com. v. Penna. Telephone Co., 2 Dauphin Co. Rep. 57; Bell Telephone Co. v. Com., 17 W. N. C. 505.

The right of eminent domain growing out of this quasi-public character of a telephone company is recognized in the following authorities: State, etc., Turnpike Co. v. Am., etc., News Co., 43 N. J. L. 381; W. U. Tel. Co. v. Short, 53 Ark. 434 (14 S. W. Repr. 649); Smith v. W. U. Tel. Co., 83 Ky. 104; Telegraph Co. v. Griswold, 37 Ohio, 301; Marr v. W. U. Tel. Co., 85 Tenn. 529 (3 S. W. Repr. 496); York Telephone Co. v. Keesey, 5 Pa. Dist. Rep. 366; Monongahela Bridge Co. v. Kirk, 46 Pa. 112.

OPINION BY BEAVER, J., January 21, 1904:

The right of eminent domain is the badge, its exercise the assertion of the sovereignty which inheres in the state. All governments framed to "promote the general welfare and provide for the common defense" must possess the right to use, when necessity exists, private property for public use, in order to meet the requirements and necessities of their existence. In this day of liberal interpretation of what constitutes public necessity and the easy way in which its agents for the exercise of the right of eminent domain are selected by the commonwealth, what Blackstone says as to the regard of the law for private property sounds old-fashioned and conservative. He says (1 Blackstone's Commentaries, 139): "So great moreover is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private per-

son, it might perhaps be extensively beneficial to the public; but the law permits no man, nor set of men, to do this, without consent of the owner of the land.   In vain may it be urged that the good of the individual ought to yield to that of the community; for it would be dangerous to allow any private man, or even any public tribunal, to be the judge of this common good, and to decide whether it be expedient or no.   Besides, the public good is in nothing more essentially interested than in the protection of every individual's private rights, as modelled by the municipal law.   In this and similar cases the legislature alone can, and indeed frequently does, interpose and compel the individual to acquiesce.   But how does it interpose and compel?   Not by absolutely stripping the subject of his property in an arbitrary manner; but by giving him a full indemnification and equivalent for the injury thereby sustained.   The public is now considered as an individual, treating with an individual for an exchange.   All that the legislature does is to oblige the owner to alienate his possessions for a reasonable price and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature can perform."

It is too well settled, however, in this country to admit of serious question that "in cases of public improvement, where benefit would result to the public, the right of eminent domain may be exercised either through the agents of the government or through the medium of corporate bodies or by means of individual enterprise:" Re Townsend, 39 N. Y. 171, and other cases cited in note to Barre R. Co. v. Montpelier & White River R. Co., 4 L. R. A. 788.

It is also true, however, and equally well settled that "the exercise of the right of eminent domain is in derogation of private rights, and the authority must be strictly construed. Rights that are not granted expressly, or by necessary implication, cannot be exercised:"   5 P. & L. Dig. of Dec. 8032.

With these general principles in mind, we come to the consideration of the provisions of the Act of April 29, 1874, P. L. 73, under which the court below made a decree, continuing a preliminary injunction, restraining the defendant from interfering with the construction of a telephone line over, across and upon his lands, on the ground that "complainant has the

right to enter upon the lands of the defendant for the purpose of constructing its telephone line over, across and upon his land, so, however, as to cause the least possible inconvenience or injury to him or to his lands and not at, near or upon any building or buildings, and that the defendant has no lawful right to resist or interfere with its so doing," the court below holding that the plaintiff had the right of eminent domain over the lands of the defendant and that, having tendered a bond which had been accepted by him, he had no right to interfere.

This raises two questions which we are called upon to consider: 1. Is a telephone company a telegraph company within the meaning of the act of 1874, supra? And 2. Did the said act confer upon a telegraph company the right of eminent domain?

As to the first question, it may be assumed, so far as the purposes of this case are concerned, that a telephone company is a telegraph company within the meaning of the act. The one transmits, electrically, human thoughts by the agency of the human hand, through or over wires or other friendly media, inditing certain signs which, translated into words, give expression to the thoughts. The other transmits, electrically, or otherwise, human thoughts by the agency of the human voice, through like media, in the words in ordinary use. The object is practically the same and, if it were necessary to a proper decision of this case, we would be ready to hold that, in view of subsequent legislation, a telephone company is a telegraph company for all ordinary purposes. In view, however, of the fact that it is not necessary to decide this question now in the view which we take of it and also in view of the decision of the Supreme Court of the United States in Richmond v. Southern Bell Telephone, etc., Co., 174 U. S. 761 (19 Sup. Ct. Repr. 778), we do not now decide this question and there, therefore, remains the single question. Has the plaintiff the power to exercise the right of eminent domain or, to speak more strictly, has the commonwealth constituted the plaintiff its agent to exercise this peculiar and dominant right of sovereignty, under the provisions of the Act of April 29, 1874, P. L. 73, supra?

In determining this question, it is well to have the several clauses of the act relating to the claim made by the plaintiff

clearly before us and we, therefore, quote the first and second clauses of section 33 which provide:

"Clause 1. Such corporation (telegraph company) shall be authorized, when incorporated, as hereinbefore provided, to construct lines of telegraph along and upon any of the public roads, streets, lands or highways or across any of the waters within the limits of this state, by the erection of the necessary fixtures, including posts, piers or abutments for sustaining the cords or wires of such lines, but the same shall not be so constructed as to incommode the public use of said roads, streets or highways, or injuriously interrupt the navigation of said waters ; and this act shall not be so construed as to authorize the construction of a bridge across any of the waters of this state."

"Clause 2. In all cases where the parties cannot agree upon the amount of damages claimed, or by reason of the absence or legal incapacity of the owner or owners no such agreement can be made, for the right to enter upon lands or premises for the purposes named in this section, the company shall tender a bond, or have the same filed in the manner provided in the forty-first section of this act, and proceedings shall be had as therein act forth."

We must take the words of the act as we find them and, although there is much apparent significance in the contention, from the context and otherwise, that the letter " d " in lands in clause 1 was substituted for the letter " e," which made it lanes, in the act as originally introduced and passed, it is unnecessary to consume time or space in the consideration of this abstract question. Lands it is in the act of assembly and lands we must assume the legislature intended, when the act was passed.

Does the adjective " public " qualify the noun " lands," as it does the other nouns in the clause of the sentence relating to the premises over and upon which a telegraph company is authorized to construct its lines? The adjective evidently qualifies roads, streets and highways. On what principle of construction, therefore, can we except it from qualifying lands in the same clause of the sentence, particularly when there are public lands in the commonwealth which may be crossed in the construction of telephone lines? Can we read public

roads, public streets, private lands or public highways ?   Surely this is not only not the ordinary interpretation nor a necessary implication from the language used but, on the other hand, would be a very forced and strained construction.

In view of the fact that we have lately held in Shevalier v. Postal Telegraph Co., 22 Pa. Superior Ct. 506, that an owner of land is entitled to damages for the erection of telephone poles upon a public road upon which his property abuts and that the decision in that case rests upon the ground that he not only has an interest in the land but is the owner of the land itself, we cannot see that the second clause of the section in question raises any special difficulty in its interpretation.

The owner of a farm, through and over which a public high-way has been laid out and opened under the right of eminent domain, is as much the owner of the land occupied by the highway after it has been laid out and opened as before.   His actual ownership or right to the fee has not been taken away. True it has been dedicated to public use and the public has the right, by reason of that dedication, to use it for the purposes of a highway, but in other respects the owner has all the rights and privileges which he had before.   He erects his buildings, he arranges the approaches thereto, he plants his shade trees with reference to the use to be made of his land as a highway. When, therefore, the commonwealth constitutes another agent to exercise its supreme right of sovereignty in another way and for another purpose, his land and premises are just as much invaded as they were originally when the highway was laid out.   The additional servitude, however imperative the public necessity which demands it, cannot be imposed without the consent of the owner and without just compensation therefor.   When, therefore, the term lands and premises is used in the second clause, it evidently refers to lands and premises previously occupied by the public roads, streets or highways over which the right to pass in the construction of its telegraph lines has been conferred by clause 1.   We are, therefore, compelled to the conclusion that not only is there no express grant of the right of eminent domain but that it is not conferred, or, in other words, that telegraph companies are not constituted the agents of the state to exercise that right upon private lands by necessary implication.   On the contrary, the internal evi-

dences of the act in question, as has already been pointed out, its comparison with other legislation of a similar character and the consideration of external considerations, all lead to a contrary conclusion.

1. If there be either an express grant or a grant by necessary implication, it is very singular that the statute under consideration has been the law for thirty years, without the assertion of the existence of the extraordinary power which is now claimed under it. This claim has been made in very recent years, so far as our numerous law reports show, and passed upon in some of our courts of common pleas but for the first time it is brought to the attention of an appellate court in Pennsylvania. This of itself is rather remarkable and would lead to the conclusion that, in the multiplication of telegraph and telephone lines all over the commonwealth, with astute legal minds, industrious and assiduous in ascertaining and asserting the rights of the corporations which controlled them, such a discovery was not sooner made because it was not heretofore believed to exist. Is it a strained inference, therefore, to conclude, or at least to argue from this fact alone, that the power to exercise the right of eminent domain is neither expressly granted nor does it arise by necessary implication. Public necessity has been the same and corporate convenience just as pressing in the past as now. Why, therefore, if the right existed, has it not been earlier invoked ?

2. Whilst it is true that the legislature is the tribunal which is to determine the public necessity for the dedication of land to a public use, it is, nevertheless, true that in determining whether or not the legislature has so dedicated it or constituted others the commonwealth's agent to use private property for a public use, it is entirely proper, in construing doubtful legislation, for the courts to determine whether or not such public necessity exists. We can see no such public necessity. There is not a hamlet in the commonwealth which is not reached by a public road, street or highway. If there be a highway for public travel, there is a way by which the plaintiff, or any company formed for like purposes, can secure the ground upon which it may plant its poles and stretch its wires. It may be more convenient to avoid turns and curves, and take advantage of shorter lines of communication,

but it is not a question of convenience to the corporation, it is a question of public necessity.

3. If telegraph companies are constituted the agent of the commonwealth for the exercise of the right of eminent domain, where in the law under which it is claimed is there any restriction as to the exercise of such a right? If the plaintiff has a right to enter upon the lands of the defendant, what limits its exercise of the right? How many lines of poles can it plant? What is the limit to the width of the arms upon which its wires are to be stretched or strung? How much ground is to be occupied by anchors, guys and stays—five feet or fifty feet or five hundred feet? How near shall the wires approach dwellings and other buildings? What is to be done with fruit, shade and ornamental trees and growing timber? What limitation or restriction, if any, is imposed upon the plaintiff in these respects? It appears from the evidence in this case that considerable young timber was destroyed. Ordinarily, the loss of this can be compensated in damages but, in case private grounds are invaded, it may be practically impossible to compensate the owner for the loss of fruit and ornamental trees which cannot, in the nature of the case, be replaced in the immediate vicinity of telegraph or telephone wires. It is true that in the present case the decree of the court limited the plaintiff "so as to cause the least possible inconvenience and injury to him or his lands, and not at, near or upon any building or buildings;" but such a limitation would seem to be purely ex gratia and not because of any limitation imposed upon the exercise of the right in the act under consideration.

In most previous legislation upon this subject the agents of the commonwealth, to whom has been entrusted the right to exercise this supreme right of sovereignty have been surrounded by proper restrictions and limitations in the exercise of the right.

The Act of February 19, 1849, P. L. 79, "regulating railroad companies," in section 10, provides "that the president and directors of such company shall have power and authority, by themselves, their engineers, superintendents, agents, artisans and workmen, to survey, ascertain, locate, fix, mark and determine such route for a railroad as they may deem expedient, not, however, passing through any burying ground or place of

public worship, or any dwelling house in the occupancy of the owner or owners thereof, without his, her or their consent, and not, except in the neighborhood of deep cuttings or high embankments, or places selected for sidings, turnouts, depots, engine, or water stations, to exceed sixty feet in width, and thereon to lay down, erect, construct and establish a railroad," etc.

Under the Act of April 9, 1867, P. L. 51, which permits land to be taken for the erection of schoolhouses, the amount permitted to be taken and occupied for that purpose shall not exceed in any case one acre.

Under the provisions of the Act of May 29, 1885, P. L. 29, " To provide for the incorporation and regulation of natural gas companies," it is provided that " if any pipe line laid under the provisions of this act or laid upon or over lands cleared and used for agricultural purposes, the same shall be buried at least twenty-four inches below the surface and, if any line of pipe shall be laid over or through any waste or woodland which shall be changed to farming land, then it shall be the duty of the corporation to immediately bury the said pipe to the depth of at least twenty-four inches as aforesaid."

So in all the provisions of the several acts of assembly relating to the laying out and opening of public roads, the maximum limits for the roads are prescribed and our courts, in laying out roads, although the authority to fix the width thereof is lodged in them, are not allowed to exceed those limits.

So also in the general corporation Act of April 29, 1874, P. L. 73, of which the clauses under consideration are a part, in the thirtieth section relating to road companies, turnpike roads are limited, under clause four, to a strip not exceeding fifty feet in width and plank road companies in the same clause to a strip not exceeding forty feet in width and both are restrained as to the erection of bridges, so as not " to obstruct the navigation of any stream declared a public highway." The same restrictions as to the obstruction of navigation are provided in the thirty-first section relating to ferries and bridge companies.

In view of these restrictions as to other corporations, was it the intention of the legislature or can we conceive that it had in mind the creation of an agent which could, without limi-

tation or restriction of any kind, exercise, under the authority of the commonwealth, the right of eminent domain ad libitum et ad infinitum? It is no answer to this proposition to say that the courts may limit the companies seeking to exercise this right by imposing reasonable limitations and restrictions in each particular case. The power which grants is the power which should limit and the fact that no limitations are imposed, the grant of power being otherwise doubtful would seem to indicate that the power was not granted.

It is scarcely necessary to say that, so far as this particular case is concerned, there does not seem to be in fact any necessity for the exercise of this extraordinary power. There is nothing in the evidence to indicate that, by following the highways, the object to be attained by crossing the defendant's lands cannot be reached.

We are, therefore, irresistibly led to the conclusion that the legislature did not intend, under the provisions of the act of assembly, under which the plaintiff claims to exercise the right of eminent domain, to confer that extraordinary and supreme power upon it, except as is clearly indicated in the act itself, and that this does not extend to the private lands of individual owners.

The decree of the court below, continuing the injunction, is, therefore, reversed and the injunction dissolved and the plaintiff's bill dismissed with costs.

PORTER, J., dissents.